Karlos **BROWN**, Appellant

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

No. 2005–SC–000078–DG.

Supreme Court of Kentucky.

June 21, 2007.

Kathleen K. Schmidt, Appeals Branch Manager, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Todd D. Ferguson, Assistant Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant Karlos Brown was convicted of possession of a controlled substance in

the first degree, operating a motor vehicle on a learner's permit without a licensed operator, and being a persistent felony offender in the first degree. He was sentenced to eighteen years' imprisonment. Prior to the presentation of the defense's case, defense counsel told the trial court he had an ethical conflict with his client and implied that his client intended to offer perjured testimony. Defense counsel was then allowed to withdraw and leave the courtroom while his client testified by way of a narrative statement, was cross-examined by the prosecution, and made his own closing statement. The Court of Appeals affirmed the conviction. Despite the ethical dilemma that defense counsel faced, because his withdrawal and exit from the courtroom amounted to a denial of Appellant's right to counsel, the judgment of the Court of Appeals is reversed.

## I. Background

The trial in this case progressed normally until the trial court took a break before the cross-examination of a witness, Officer King. The prosecutors and defense counsel approached the bench after the break, and defense counsel informed the court that after several discussions with his client, he had concluded that a conflict had arisen which he wanted to address to the court outside the presence of the prosecution. The court allowed the ex parte discussion, during which defense counsel informed the court that the Appellant wanted to present through his testimony a theory that was not consistent with counsel's investigation of the case. Counsel told the court that his client wanted to testify, and had the right to do so, but that counsel felt his ethical limitations created a conflict with the client. He stated that he did not

believe he could deliver his planned opening statement or elicit the testimony Appellant now wanted to give.

The trial court and defense counsel then took a break to consult the Rules of Professional Conduct, specifically Rule 3.3 [1] and its commentary. On returning, they again conferred on the record but outside the presence of the prosecutors on possible options for proceeding. Appellant was brought to the bench, and the trial court conducted a lengthy and thorough colloquy with him, setting forth the situation and presenting options, and directing him to consult further with his attorney before making a final decision on how he was going to proceed. The court did, however, at one point tell Appellant and his counsel that, in addition to allowing Appellant to make a limited narrative statement of his own testimony and a closing argument, Appellant could choose to have counsel remain in the courtroom or to excuse counsel, who would then leave the courtroom. Defense counsel offered to cross-examine the final two prosecution witnesses and informed the court that he would then be *stepping out of the courtroom*. On hearing this, Appellant told the court that *counsel could remain*, but the court said that counsel did not want to do that. The court also asked Appellant if he wanted her to explain to the jury that he would be representing himself from that point forward, and Appellant told the court she did not have to tell the jury anything. Defense counsel indicated that he had discussed with his client that it might make things worse if he remained seated at counsel table while his client proceeded.

At no point during these discussions were specific statements as to the nature of the alleged perjury put on the record.

---

1. The Rules of Professional Conduct are codified as Supreme Court Rule 3.130. References herein to a "Rule" or "rules" are to the Rules of Professional Conduct, unless indicated otherwise.

In fact, the most that was disclosed was that Appellant was prepared to testify in a manner inconsistent with defense counsel's investigation, and that he was about to proceed on a theory of the case that was not in his best interest. The trial court, however, appears to have read these disclosures as implying that Appellant was set to commit perjury, as she repeatedly informed Appellant of the dangers of untruthful testimony and how it created a conflict with his attorney.

After the prosecutors completed their case, they and defense counsel approached the bench and made motions. Defense counsel then shook hands with the prosecutors and left the courtroom, but remained on call nearby. The trial court determined that if there were a guilty verdict, he would return for the sentencing phase because the Appellant's testimony would no longer matter. The court then told the jury that the defendant had chosen to represent himself from that point forward.

Appellant then testified in narrative fashion to his version of events and was cross-examined by the prosecution. He was the only defense witness. He gave his own closing argument, and was found guilty by the jury. Defense counsel returned and represented Appellant in the sentencing phase of the trial. The trial court subsequently entered a judgment of conviction and sentence of imprisonment.

On direct appeal, the Court of Appeals affirmed Appellant's conviction, holding that he had waived his right to counsel when he proceeded against his attorney's advice, and that his attorney had acted properly in not assisting him to present false testimony. This appeal followed on a grant of discretionary review.

Appellant now argues that he was unconstitutionally forced to proceed without counsel during his testimony and in closing argument. He also claims he was prevented from adequately impeaching a prosecution witness, Officer King, to show bias.

## II. Analysis

An attorney in circumstances such as these finds herself trying to balance the client's constitutional rights and the duty to keep the client's confidences with the duty of candor to the court. When the situation arises during trial, as it did in this case, determining the correct course of action is difficult, to say the least. Of equal difficulty is the trial judge's decision on how to proceed once the problem is revealed. Fortunately, the scenario presented by this case does not happen frequently, but this also means that the correct procedures are not well-settled by court decisions.

Under Rule 3.3,[2] a lawyer is prohibited from offering evidence known to be false, may refuse to offer evidence that she rea-

---

**2.** Rule 3.3 provides:
 (a) A lawyer shall not knowingly:
 (1) Make a false statement of material fact or law to a tribunal;
 (2) Fail to disclose a material fact to the tribunal when disclosure is necessary to avoid a fraud being perpetrated upon the tribunal;
 (3) Offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

 (b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.
 (c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.
 (d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.

sonably believes to be false, and shall inform the tribunal of all material facts known to her so that the tribunal can make an informed decision whether the facts are adverse. The plain language of this rule contemplates that a lawyer will not advance false testimony of any witness, and that she will inform the court if such testimony is imminent and what facts support that belief. However, Rule 1.6[3] creates a duty of confidentiality that prohibits a lawyer from revealing information related to the representation of a client. Moreover, the client has a right to testify in his own defense and a right to counsel. This creates an apparent conflict when an attorney knows that a client intends to offer false testimony. (No such conflict exists when the witness is not a client.)

Despite the tension between Rules 1.6 and 3.3 and the rights to testify and to counsel, when the false testimony involves the client, Rule 3.3(b) requires disclosure, even if otherwise protected by Rule 1.6. As the Commentary to Rule 1.6 points out, the duty of confidentiality is not absolute and other provisions of the Rules of Professional Conduct, such as Rule 3.3, require a lawyer to disclose information relating to the representation in some circumstances.

■ When a lawyer determines that her client is about to offer false testimony, all sources agree that the lawyer should first seek to persuade the client that such evidence should not be offered. Sometimes this is successful, and any conflict is resolved. There is no duty to inform the court of the problem in such a situation.

■ When the client is adamant about proceeding, however, the lawyer's dilemma arises. In civil cases, the general rule is that the deception must be disclosed to the court to avoid having the lawyer coerced into being a party to fraud on the court. But in a criminal case, as we have here, other rights of the accused are also impacted, such as the right to counsel, the right to testify, and the right not to incriminate oneself.

■ There are substantially different opinions on how a lawyer should proceed when she knows or has reason to believe that a criminal defendant is about to commit perjury and the client insists on testifying. If the lawyer knows before trial, she may usually be allowed to withdraw without revealing the specifics of the conflict. But if the trial is imminent, or in progress, as here, there are problems with any course of action.

If the lawyer attempts to address the situation, this may increase the likelihood that the client will be convicted or charged subsequently with perjury. By informing the court, the lawyer brings a third party into the equation who must make rulings in regard to the disclosure. The effect of

---

**3.** Rule 1.6 provides:

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) To prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm; or

(2) To establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client; or

(3) To comply with other law or a court order.

those rulings may be to tip off the prosecution that perjury is about to be committed, or to cause the jury to suspect that the client is lying, both of which are prejudicial to the client and may not be correct. If the attorney is to proceed in this manner, she must then determine how much to tell the court, in order to ensure that these steps are taken with good reason. In contrast, failure to inform the court may lead the lawyer to at least passively assist in deception of the tribunal, which could subsequently lead to disciplinary charges or criminal complicity charges against the lawyer. *See* KRS 502.080 (liability for the conduct of another through complicity).

Some believe that the lawyer should be entirely excused from revealing the potential perjury when the witness is her client, giving more weight to the attorney-client relationship of confidentiality than candor to the court. These theorists take the position that the ability of a client to feel safe in his confidences to his attorney is so important to adversarial jurisprudence that the lawyer should be given a pass on any ethical or criminal violation. *See* Rule 3.3 cmt. 8; *see also* Monroe H. Freedman, *Perjury: The Lawyer's Trilemma,* 1 Litigation 26, 30 (1975) (arguing that "the criminal defense attorney, however unwilling in terms of personal morality, has a professional responsibility as an advocate in an adversary system to examine the perjurious client in the ordinary way and to argue to the jury, as evidence in the case, the testimony presented by the defendant"); Barrie Althoff, *Ethical Responsibility of Candor to Judges,* Wash. St. Bar News, Oct. 1998 (arguing that the "may refuse to offer" language of Washington's Rule 3.3(e) allows the attorney discretion whether to offer false evidence). The problem with this approach is that the lawyer thus becomes "a knowing instrument of perjury," Rule 3.3 cmt. 9, and it flies in the face of the goal of any trial, which is to arrive at the truth. *See also In re Carroll,* 244 S.W.2d 474 (Ky.1951) ("Under any standard of proper ethical conduct an attorney should not sit by silently and permit his client to commit what may have been perjury, and which certainly would mislead the court and the opposing party on a matter vital to the issue under consideration.").

Another possible resolution is that the accused be permitted to testify by narrative statement without the benefit of his attorney's questioning and without informing the court of the specific reasons for the departure from regular examination. This solution, however, "compromises both contending principles" (the duty of candor and duty of confidentiality) by simultaneously "exempt[ing] the lawyer from the duty to disclose false evidence but subject[ing] the client to an implicit disclosure of information imparted to counsel." Rule 3.3. cmt. 9. Moreover, the "lawyer participates, although in a merely passive way, in deception of the court," Rule 3.3 cmt. 8, and the defendant gets to lie to the jury without serious challenge, other than the implicit question raised by the unorthodox procedure. *Nix v. Whiteside,* 475 U.S. 157, 170 n. 6, 106 S.Ct. 988, 996 n. 6, 89 L.Ed.2d 123 (1986) (citing ABA Standards for Criminal Justice, Proposed Standard 4–7.7 (2d ed.1980)).

The third solution is that the lawyer reveal that her client is about to commit perjury, and the substance of what she believes the perjury to be, because no client has the right to assistance of counsel in committing perjury. Permitting perjured testimony undermines the fundamental purpose of finding the truth. This solution is what is generally contemplated by Kentucky's version of Rule 3.3.

Often, clear statements are easier said than done. Under Rule 3.3, the question

arises of how to best protect conflicting interests and rights. Rules 3.3(b) and (d) require ex parte disclosure of material facts to the court to enable it to determine "whether or not facts are adverse." However, the rule does not specifically state when these facts must be disclosed or when the court must rule on them. To do this in a coherent fashion in the middle of a trial is difficult, and will clearly be prejudicial.

The approach taken in *Commonwealth v. Mitchell*, 438 Mass. 535, 781 N.E.2d 1237 (Mass.2003), while applying a somewhat different version of Rule 3.3, appears to address all relevant concerns. At trial, the defendant's lawyer advised the court that the defendant would present false testimony to the jury, that counsel had attempted to persuade the defendant to not testify falsely, and that counsel needed instruction from the judge on how to proceed before the jury. Rule 3.3 of the Massachusetts Rules of Professional Conduct specifically does not require a lawyer to withdraw from a case if she reasonably believes that it would prejudice her client, and states that a lawyer "shall not reveal the false testimony to the tribunal," but that the lawyer shall not elicit any testimony she knows to be false or argue the probative value of any false testimony. In *Mitchell*, before the defendant testified, the attorney and the Commonwealth approached the court, where the defense attorney told the court he had concerns about participating in a fraud on the court, but could not reveal more without violating the attorney-client privilege.

The defense attorney then told the court that he wanted to put the defendant on the stand, ask him his name, and let him tell his story to the jury. He informed the court that he would not seek to withdraw to avoid prejudicing his client, and that he had tried to dissuade his client to no avail.

The judge agreed to let him continue, and ordered that he should remain standing during the defendant's testimony, and make objections during cross examination, one question at a time, to avoid assisting the defendant in perjury. The attorney then asked the defendant, "Mr. Mitchell, what do you wish to tell these jurors?" and testimony proceeded in a narrative fashion. The attorney did not argue the defendant's testimony during closing argument, and the court refused the defendant's request to make an unsworn statement to the jury. The defendant was convicted.

The defendant filed a motion for a new trial claiming that the attorney and the court did not properly follow Rule 3.3, thus denying him several rights. The trial court considered sworn statements of the defendant and the defense attorney as to the specifics of their dispute, and denied the motion. The court found that the trial attorney "knew" the proposed testimony would be perjury and met the standard of having "a firm factual basis" for concluding the defendant would commit perjury; that there was no conflict of interest creating actual prejudice; and that by his actions the defendant had made a voluntary and knowing waiver of assistance of counsel with respect to the defendant's disputed testimony only.

The Massachusetts Supreme Judicial Court held that the trial court was correct, stating:

> Not unexpectedly, courts have adopted differing standards to determine what an attorney must "know" before concluding that his client's testimony will be perjurious. The standards include the following: "good cause to believe the defendant's proposed testimony would be deliberately untruthful," *State v. Hischke*, 639 N.W.2d 6, 10 (Iowa 2002); "compelling support," *Sanborn v. State*, 474 So.2d 309, 313 n. 2 (Fla.Dist.

Ct.App.1985); "knowledge beyond a reasonable doubt," *Shockley v. State,* 565 A.2d 1373, 1379 (Del.1989); a "firm factual basis," *United States ex rel. Wilcox v. Johnson,* 555 F.2d 115, 122 (3d Cir. 1977); a "good-faith determination," *People v. Bartee,* 208 Ill.App.3d 105, 108, 153 Ill.Dec. 5, 566 N.E.2d 855, cert. denied, 502 U.S. 1014, 112 S.Ct. 661, 116 L.Ed.2d 752 (1991); and "actual knowledge," *United States v. Del Carpio–Cotrina,* 733 F.Supp. 95, 99 (S.D.Fla.1990) (applying "actual knowledge" standard to require factual basis). The judge properly rejected standards that were too lenient (good cause to believe) or too rigid, particularly the standard sought by the defendant, knowledge beyond a reasonable doubt. The knowledge beyond a reasonable doubt standard essentially would eviscerate rule 3.3(e). That standard, as described by one court, is "virtually impossible to satisfy unless the lawyer had a direct confession from his client or personally witnessed the event in question." *State v. Hischke, supra* at 10. The standard would also tend to compel defense attorneys to remain silent in the face of likely perjury that a sharp private warning could nip in the bud. See *Nix v. Whiteside,* 475 U.S. 157, 169, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

The judge correctly settled on the firm basis in fact standard. This standard satisfies constitutional concerns because it requires more than mere suspicion or conjecture on the part of counsel, more than a belief and more information than inconsistencies in statements by the defendant or in the evidence. Instead, the standard mandates that a lawyer act in good faith based on objective circumstances firmly rooted in fact. The lawyer may act on the information he or she possesses, and we decline to impose an independent duty on the part

of counsel to investigate because such a duty would be "incompatible with the fiduciary nature of the attorney-client relationship," *United States v. Del Carpio–Cotrina, supra* at 99 n. 9, and is unnecessary when an attorney relies, in significant part, on incriminating admissions made by the client.

*Mitchell,* 781 N.E.2d at 1246–47 (footnote omitted).

Further, as to the procedure followed by the trial court, the court stated:

The narrative form of testimony was properly directed. This approach was adopted by the ABA in 1971. See ABA Standards for Criminal Justice 4–7.7 (Approved Draft 1971). Although the ABA later rejected this approach and currently suggests that the lawyer may examine as to truthful testimony, and although the approach has been criticized, see *United States v. Long,* 857 F.2d 436, 446 n. 7 (8th Cir.1988), "the narrative [approach] continues to be a commonly accepted method of dealing with client perjury." *Shockley v. State,* 565 A.2d 1373, 1380 (Del.1989). See *Butler v. United States,* 414 A.2d 844, 850 (D.C.1980); *Sanborn v. State* 474 So.2d 309, 313 & n. 3 (Fla.Dist.Ct.App. 1985); *People v. Bartee,* 208 Ill.App.3d 105, 108, 153 Ill.Dec. 5, 566 N.E.2d 855 (1991). The defendant suggests that his trial counsel should have conducted a direct examination with respect to the "non-suspect" portions of his testimony and should also have argued the truthful portions of the defendant's testimony in his closing argument. The former suggestion has been justifiably criticized by the Criminal Justice Section of the ABA: "[T]his is the worst approach of all.... This [approach] would be far worse for the client than saying nothing, not to mention it would be virtually impossible to control once the client takes the

stand. And what about cross? How can you possibly prepare your clients for that? Tell them not to answer any questions that they do not like?" ABA Criminal Justice Section, Ethical Problems Facing the Criminal Defense Lawyer at 162 (1995). The latter suggestion is impractical, as it may call attention to testimony of the defendant that is not argued by trial counsel, and would likely lead to counsel's making an incoherent final argument. We shall not impose these requirements on counsel. Further, to permit the defendant to make an unsworn statement or his own closing argument would allow him to do what rule 3.3(e) prohibits his counsel from doing, arguing perjured testimony to the jury. The defendant's testimony was placed before the jury, and his trial counsel made a persuasive, well-reasoned closing argument to the jury. The judge correctly concluded that the defendant was not "denude[d]" of a defense.

*Id.* at 1249 (alterations in original).

In conclusion, the court summarized the competing interests, stating:

A summary of our disposition of this issue is now in order. The duties imposed on a criminal defense lawyer (zealous advocacy, preservation of client confidences, avoidance of a conflict of interest) and the constitutional rights granted a defendant (effective legal representation, opportunity to testify in his own defense, right to a fair trial) are circumscribed by what we demand of honorable lawyers and the core principle of our judicial system that seeks to make a trial a search for truth. The rights of a defendant are not so exclusive that justice can be subrogated to the defendant's perceived interests thereby dismissing or ignoring the inter-

ests of victims and the Commonwealth. . . .

The standard set forth in rule 3.3(e) "confirm[s] that the legal profession has accepted that an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct; it specifically ensures that the client may not use false evidence. This special duty of an attorney to prevent and disclose frauds upon the court derives from the recognition that perjury is as much a crime as tampering with witnesses or jurors by way of promises and threats, and undermines the administration of justice." (Footnote and citation omitted.) *Nix v. Whiteside, supra* at 168–169, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123. The standard in no way abridges constitutional rights of a defendant. There is no constitutional or permissible right of a defendant to testify falsely. When defense counsel attempts to persuade a defendant to testify truthfully, counsel is not depriving the defendant of his right to counsel nor the right to testify truthfully. "In short, the responsibility of an ethical lawyer, as an officer of the court and a key component of a system of justice, dedicated to a search for truth, is essentially the same whether the client announces an intention to bribe or threaten witnesses or jurors or to commit or procure perjury. No system of justice worthy of the name can tolerate a lesser standard." *Id.* at 174, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123.

*Id.* at 1250 (alteration in original).

 While there are differences in specific language between the Massachusetts rule and Kentucky's version of Rule 3.3, the procedure laid down in *Mitchell* is coherent and adequately addresses the competing interests at play under the cir-

cumstances of the present and similar cases. When the question of a client's imminent perjured testimony arises during trial, the attorney must comply with Rule 3.3 by bringing the existence of a potential conflict to the court's attention. Under Kentucky's Version of Rule 3.3, she must state "all material acts" necessary to establish the adversity between her and the client. This does not, however, require a detailed evidentiary statement of the disagreement. A clear statement of the nature of the problem will suffice. Also, before an attorney invokes Rule 3.3, she must in good faith have a firm basis in objective fact for her belief, beyond conjecture and speculation, that the client will commit perjury. This does require a difficult judgment call from the attorney, but it is only one of many tightropes an attorney is called to walk during the complex process of litigation. Counsel must rely on facts made known to her by her client, not on a subjective belief that the client might be lying or that the client's consistent version of events differs from other evidence.

 Once the trial court is made aware of the potential for perjury, the court must evaluate the situation and instruct counsel on how to proceed. It is consistent with Kentucky's Rule 3.3 for the court not to conduct an evidentiary hearing during trial because even though the Rule requires disclosure, it does not say it must be made with specific detail during trial. For reasons of judicial economy, it is appropriate to reserve specific disclosure of the basis of the attorney's belief until a motion for new trial is made by the defendant; he could be acquitted, or the motion never made. It is also not necessary for the court to appoint an independent attorney or question the defendant about his testimony. However, the court should engage in a colloquy with the defendant, like that in this case, about the

importance of truthful testimony and the attorney's ethical obligations and to generally educate the defendant about the nature of the situation, thus giving the defendant a chance to further consider any possible course of action. "If the defendant, now informed, moves for appointment of new counsel (and, concomitantly, a mistrial), the judge should deny the motions unless the defendant can demonstrate that such motion must be allowed to prevent a miscarriage of justice." *Mitchell*, 781 N.E.2d at 1251.

 It is also appropriate for the defendant to present the contested testimony in narrative form, in his attorney's presence, and with the attorney continuing to represent him by making appropriate objections on cross-examination regarding portions of the testimony she does not believe to be perjured. In this manner, the defendant is always represented by counsel on matters for which he is entitled to be represented, not involving perjury. It is a denial of counsel to completely deprive a defendant of representation on matters not involving the alleged perjury. Because the defendant has made a knowing waiver of counsel as to any perjured testimony, there is no actual or prejudicial conflict between him and his attorney. An attorney may thus continue to represent her client on all parts of the trial not connected to the alleged perjury. If on a motion for new trial a court determines that there was not a good faith basis for the attorney's belief and the attorney's actions prejudiced the client, then a new trial can be granted with new counsel.

Finally, the procedure described above is not exclusive. As the *Mitchell* Court noted of its process:

> No comprehensive canon can be written on all aspects of practical implementation because each case will have its own idiosyncrasies, and the judge cannot

then be informed of the details underlying counsel's invocation of rule 3.3(e). The judge possesses considerable discretion to vary any of the procedures discussed, if the interests of justice, or effective management of the trial so requires.

781 N.E.2d at 1251.

This process is not perfect; such could exist only in the absence of even the possibility of perjury. However, it addresses the competing interests created by this situation arising during trial. The defendant is never without counsel inappropriately. He is not denied his right to testify as he wishes. The attorney avoids participating in a fraud upon the court, yet does not prematurely disclose the specifics of her client's confidence. The trial is not derailed by this controversy, and the Commonwealth is not prejudiced by undue delay. In future cases where this controversy arises, this is the approved approach to apply Rule 3.3 and Rule 1.6 without conflict.

 Turning to the present case, trial counsel and the court assiduously tried to find a proper solution to the problem with which they were confronted. Defense counsel did properly reveal his concern to the court in a manner that did not accuse his client of perjury, but nevertheless alerted the court that a problem with candor existed. The court properly advised counsel to discuss the matter with his client and to try to persuade him not to give the questioned testimony. Further, the court spoke directly with the Appellant in an abundance of caution to ensure that he understood the problems with what he was doing. Counsel and Appellant were given time to carefully consider their course of action. But Appellant remained adamant and was given the opportunity to testify as he saw fit.

However, the court did err in advising Appellant and counsel that counsel could leave the courtroom during the narrative testimony. They either chose this option together or defense counsel chose his preference—the record does not disclose which. By completely leaving the courtroom, in the presence of the jury, counsel telegraphed a problem to the jury. This was improper absent a knowing and voluntary waiver of counsel by Appellant as to representation beyond the perjured testimony. Counsel should have remained to assist when he could, since only counsel knew what he believed to be a proper question or an improper one. It remains unknown whether counsel had a good faith, firm factual basis to believe the testimony would be perjury. Had counsel remained and assisted when he could, the need for specific findings would not have arisen until a motion for a new trial was filed. However, given that no one other than counsel and Appellant knew the contested area of testimony, requiring Appellant to testify wholly on his own and without benefit of counsel's objections on cross examination (which would have been directed at evidentiary rules rather than content), Appellant was unconstitutionally deprived of his right to assistance of counsel. This was compounded by requiring him to make his own closing argument and allowing counsel to return to conduct the sentencing phase.

Although valiantly trying, the court did not properly balance all the competing interests in this trial as the process set forth above would have required. Given the complexity of the issues, and the lack of time inherent in the trial process, this is understandable. Nonetheless, reversal is required.

### III. Conclusion

When an attorney determines at trial that her client is about to perjure himself,

Rule 3.3 shall be read to require procedures consistent with this Opinion, which shall not be deemed to violate Rule 1.6.

Further, the trial court in this case made heroic efforts to guard all parties' rights in a very difficult scenario. Her colloquy with the defendant was very thorough, and sets a good example of what should be addressed to the defendant in circumstances such as these. The only error was in allowing trial counsel to completely abandon defendant during his narrative statement, cross-examination and closing argument in the guilt phase of the trial. Allowing counsel to then reappear for the penalty phase, while technically logical, nonetheless prejudicially compounded the appearance of irregularity to the jury. This all served to deprive Appellant of counsel at critical stages of the trial.

Because this Court finds that Appellant is entitled to a new trial on his claim of denial of assistance of counsel, it is not necessary to address his claim that he was improperly prevented from adequately impeaching Officer King, as the error, if any, is unlikely to recur at retrial.

Consequently, the judgment of the Court of Appeals is reversed, and this case is remanded to the Jefferson Circuit Court for a new trial.

LAMBERT, C.J.; CUNNINGHAM and MINTON, JJ., concur.

CUNNINGHAM, J., concurs by separate opinion in which LAMBERT, C.J.; MINTON and NOBLE, JJ., join.

SCOTT, J., dissents by separate opinion in which McANULTY, J., joins.

SCHRODER, J., not sitting.

Concurring opinion by Justice CUNNINGHAM.

We reverse the trial court, but not without empathy for its plight. The trial judge struggled gallantly with an almost impossible situation. It is doubtful that any of us here could have done better. That is because there is almost a dearth of guidance afforded by this tribunal or other authorities as to how to deal with such a situation. I think we should attempt to provide some light for this darkened trail.

The main obligation of a trial judge is to protect the integrity of the court proceedings over which he or she is the designated gate keeper. The law does not afford perjured testimony constitutional protection. *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

However, I would disagree to some extent with the well written and thoroughly researched opinion of my sister jurist.

In this case there was too much "cryptic" dialogue between the judge and the attorney. In reviewing the record, we cannot clearly discern whether it was indeed perjured testimony hovering over the proceeding, or something less nefarious. The subtle message conveyed by the defense lawyer would cause us—as it obviously did the trial judge—to conclude that it was perjured testimony to which he was referring. But considering the dire consequences for the defendant which followed, it was not nailed down nearly well enough.

The explanation that the defendant's expected testimony was "not consistent with my investigation" leaves too much room for interpretation. Frustration is a constant co-counsel to every trial lawyer. Clients may provide totally implausible and unbelievable stories for presentation to juries. Defense lawyers have to live with them. Defendants sometime even change their stories on the day of trial.

Where does the truth lie? Not only is it impossible to always know, but it isn't even the defense lawyer's duty to know. That is left to the rigorous exchange of cross examination, and ultimately the collective decision of the jurors. At one point in the discussion with the trial judge, the defense lawyer seemed to lament that he would have to change his opening statement. This hints, if faintly, that an unexpected change in trial strategy was the main burden being shouldered by counsel for the defendant.

Section 3.3(a)(3) of the Rules of Professional Conduct states that a lawyer shall not knowingly "offer evidence that the lawyer knows to be false." Subsection (c) of that same provision states, "A lawyer may refuse to offer evidence that the lawyer reasonably believes is false." This offers an inviting escape hatch for lawyers looking for a convenient exodus from difficult cases. Therefore, it should be closely guarded by trial judges to prevent abuse by lawyers looking for an exit from a case gone south. Judges should not be placed in a guessing game, but rather should hold candid conversations with defense attorneys.

The judge and the lawyer in this case danced ever so gently around the use of the brutally frank language that is needed in such cases. In an ex parte hearing with a sealed record, the lawyer should fully disclose to the judge the grounds of the request to withdraw. Such direct language as, "Judge, I have reason to know that my client intends to give false testimony under oath," would remove any question about the dilemma of both the lawyer and the judge. The trial court would then be given the opportunity to explore the "reason to know."

At that point, remedial steps should be within the discretion of the trial judge. A mistrial may be the deemed solution.

However, this is always a drastic step because a mistrial comes at the expense of judicial economy, and also may just be passing the problem on to the next lawyer, the next judge, the next trial.

Contrary to the sentiment expressed in the majority opinion, I disagree with the holding in *Commonwealth v. Mitchell* that the "representation of counsel .... of necessity would be cryptic." Dealing with the possibility of perjured testimony is a very serious process and should not be reduced to a guessing game. Ambiguity is the last thing needed. In addition, logic is stretched to the breaking point. Arguably, a lawyer providing guarded hints to the trial judge about information acquired through confidential communication is just as much in breach of the canon as an attorney making a direct and unambiguous disclosure. Also, the effect upon the trial court's ability to continue in a neutral role remains the same whether the point is made directly or through "cryptic" comments.

In cases such as this one, I would require the lawyer to stay on the case and even put his client on the stand if the latter chooses. There is always the possibility—remote as it may be—that the client will have a change of heart between counsel table and the witness stand. However, once the client proceeds to give the perjured testimony, then the lawyer becomes ethically bound to cease and desist further questioning of the witness. The fact that the client will be left to twist in the wind is of the client's own making and the inescapable peril of an impossible situation—("wings for angels; feet for men.") Counsel would then be prohibited from commenting on the perjured testimony during the trial, including closing arguments. It is also important that counsel advise his or her client of the likely effects

of giving perjured testimony before the defendant decides to testify at all.

This disclosure should not bring into jeopardy the objectivity and fairness of the trial judge in conducting the remainder of the trial. Judges regularly rise above such developments. It is constant fare for things to happen at trial which could prejudice the judge against the defendant. In most cases, judges have an experienced notion of the truthfulness of the defendant's testimony. He or she must still remain fair and objective in ruling on issues that are raised during the remainder of the trial, as well as in sentencing if the trial concludes with a conviction.

Also, it is the opinion of this writer that the judicial requirement of this ex parte conversation between judge and lawyer cleanses the lawyer of all adverse ethical considerations which might come into play. In other words, as the canons already imply, Rule 3.3 trumps Rule 1.6.

Perhaps the most troublesome aspect of this imbroglio is how to proceed with the trial if the court denies a mistrial. The procedure used in this case was what the trial judge, under immense pressure, deemed proper. From the comfortable lounge of reflection and retrospect, it is obviously flawed. The defendant became counsel-less at a most critical stage of the trial. In addition, the jury returned to the courtroom to see that his lawyer had deserted him. The admonition given by the trial judge in an attempt to minimize the damage was not only inadequate but misleading. The defendant did not fire his lawyer. Rather, the lawyer chose to leave his client. The problem was then compounded once the lawyer reappeared at the sentencing stage, as if he had somehow had a change of heart or pocketbook.

For the above stated reasons, I concur in the result of the majority opinion herein but would vary somewhat as to its reasoning and direction.

LAMBERT, C.J.; MINTON and NOBLE, JJ., join.

Dissenting opinion by Justice SCOTT.

Appellant was advised at length of the potential consequences of presenting false testimony, not only by counsel, but twice by the court. Yet, he still persisted. Because of this conduct, the trial court imposed a "limited forfeiture" of his right to the assistance of counsel, at Appellant's counsel's request, *designed solely to keep counsel's hands away from the false evidence.* Because, I believe this "limited forfeiture" of Appellant's right to the assistance of counsel was appropriate under our constitutional jurisprudence and ultimately more protective of Appellant's constitutional rights to testify and to a fair trial than the alternative mandated by the majority, I must respectfully dissent.

The American Criminal Justice System grants the rights of an accused more preeminence than any other system of justice on earth. This grant is premised upon the belief of our founders, bequeathed for posterity to us today, that, "it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship,* 397 U.S. 358, 372, 90 S.Ct. 1068, 1077, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). It is this standard, bounded by an earnest search for the truth, which guides our jurisprudence. *See, e.g., United States v. Havens,* 446 U.S. 620, 626, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) ("There is no gainsaying that arriving at the truth is a fundamental goal of our legal system."); *Escobedo v. State of Illinois,* 378 U.S. 478, 488–89, 84 S.Ct. 1758, 1764 12 L.Ed.2d 977 (1964) ("We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement, which comes to depend on the 'confession' will, in the

long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation."); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1964) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

This belief is reflected in the Bill of Rights of our United States Constitution, as well as the Constitution of this Commonwealth. As these constitutional principles have been our beacon of truth for over two hundred years, we would do well to steer the same course today.

During the Commonwealth's case-in-chief, Appellant's counsel advised the court that after several discussions with Appellant, a conflict had arisen between them. Because of *the nature of the conflict*, counsel discussed the conflict with the court outside the presence of the Commonwealth and advised the court that he and Appellant had discussed *what the evidence will and won't be* and that the *theory* Appellant now wanted to present to the jury through his testimony *was not consistent with what had been disclosed* during counsel's investigation of the case.

Counsel further advised that he was now in a dilemma, that Appellant wanted to testify, had a right to testify, *but counsel could not ethically assist in his testimony.* Counsel also acknowledged that normally he would tell the jury what Appellant's testimony was, but he could not do that in

this case because *he could not use* Appellant's testimony.[1]

The court then discussed the matter at length with Appellant and his counsel, advised Appellant extensively of the dangers and disadvantages of self-representation and that he had a right to testify, but if he testified *falsely,* he did not have a right to have counsel assist him in presenting the testimony to the jury. The court then directed Appellant and counsel to discuss the matter further during the lunch break. Following lunch, Appellant's counsel advised the court that they were still in the same predicament and thus, after examination of the remaining officers, *he* would request permission to leave the courtroom.

The case then continued with cross-examination of the officers, after which the Commonwealth announced a close of their case in chief. Counsel for the Appellant then moved for various directed verdicts, which were denied. He also previewed the instructions the court would ultimately give in the "guilt phase" and advised the court he had no objection to them.

The trial court then excused defense counsel, but kept him on call in the event of a guilty verdict.[2] The jury, of course, was not aware of this, as the court told the jury that Appellant had chosen to represent himself from that point forward. Appellant then took the stand, gave his testimony in a narrative fashion, and was cross-examined. His cross-examination lasted seventeen minutes and produced no significant disclosures.

Being the only witness for his defense, Appellant closed his case. After instructions, he gave a closing argument, which consisted of *all the evidence* given in his

---

1. These "cryptic statements" lead to only one conclusion for those experienced in criminal law and professional ethics.

2. The trial court did discuss keeping counsel in the courtroom, but was advised by Appellant's counsel that he and Appellant had discussed this, and counsel felt it would look worse on Appellant.

narrative.[3] The case was submitted to the jury which took *seven hours to reach a verdict,* finding Appellant (1) *not guilty* of trafficking in a controlled substance in the first degree (cocaine), while in the possession of a firearm; (2) *not guilty* of trafficking in a controlled substance in the first degree (cocaine); (3) *not guilty* of illegal possession of a controlled substance in the first degree (cocaine) while in the possession of a firearm; and (4) *not guilty* of tampering with physical evidence. He was found guilty of illegal possession of a controlled substance in the first degree (cocaine) and driving on a permit without a licensed operator, a misdemeanor.

Following the verdict, Appellant's counsel returned to the courtroom and resumed representation of Appellant for the sentencing phase. At the conclusion, the jury fixed Appellant's punishment at five years for the illegal possession of a controlled substance in the first degree (cocaine), but found him guilty of being a persistent felony offender in the first degree and increased his punishment to eighteen years.

On appeal, the judgment of the Jefferson Circuit Court was unanimously affirmed by the Court of Appeals. This Court granted discretionary review and now reverses the conviction on the basis of a denial of Appellant's Sixth Amendment right to counsel.[4]

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court summarized the right to counsel as follows:

> The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, *who plays the role necessary to ensure that the trial is fair.*

466 U.S. at 685, 104 S.Ct. at 2063 (internal citations omitted) (emphasis added). "[A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Id.*

---

**3.** In his narrative testimony and closing argument, Appellant pointed out that (1) the cocaine found beside the car he was driving was not his, (2) since he didn't know where it came from, it must have been planted by the arresting officers; and (3) he did not know there was a gun under the seat of the car, as the car belonged to his girlfriend.

**4.** What we are really dealing with is a premature claim of "ineffective assistance of counsel." "As a general rule, a claim of ineffective assistance of counsel will not be reviewed on direct appeal from the trial court's judgment, because there is usually no record or trial court ruling on which such a claim can be properly considered." *Humphrey v. Commonwealth,* 962 S.W.2d 870, 872 (Ky.1998). "[C]laims of ineffective assistance of counsel are best suited to collateral attack proceedings, after the direct appeal is over, and in the trial court where proper records can be made." *Id.* This is because SCR 3.130–1.6 prohibits a lawyer from revealing information relating to representation of a client without the client's consent, unless disclosure is necessary, among other reasons, to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client.

By not treating the matter as one involving the issue of "ineffective assistance of counsel" to be resolved in a post-conviction proceeding, on a record with findings, *we are deprived of a procedure* where a defendant *must raise* the issue in a manner *which allows an attorney to ethically respond,* and thus, for the trial court to make findings upon which we may rely. Thus, the issue is now presented and *decided without the corresponding impact of appellant's conduct;* whether it be beneficial or detrimental. Thus, I fear the court's focus is *more on what the court did* than what Appellant did.

What constitutes a fair trial, of course, is necessarily dependent upon the context of the circumstances within which the trial occurs. *See, e.g., Deck v. Missouri*, 544 U.S. 622, 633, 125 S.Ct. 2007, 2014–15, 161 L.Ed.2d 953 (2005) ("The constitutional requirement, however, is not absolute. It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling."); *Illinois v. Allen*, 397 U.S. 337, 343–44, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970) ("We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant . . . (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly."); *Peterson v. Commonwealth*, 160 S.W.3d 730, 733 (Ky.2005) (defendant remained in handcuffs and leg irons throughout trial); *Hill v. Commonwealth*, 125 S.W.3d 221, 233 (Ky.2004) (defendant argued that leg shackles on him throughout the trial violated his constitutional right to be presumed innocent); *Hodge v. Commonwealth*, 17 S.W.3d 824, 839 (Ky.2000) ("We do not view this security force as excessive in view of Appellant's previous conviction and sentence to death in this case and his previous conviction and sentence to death for a similar burglary/murder committed in August 1985."); *Commonwealth v. Conley*, 959 S.W.2d 77 (Ky.1997) (prisoner, who escaped during arraignment, could be shackled to prevent escape during trial); *and Tunget v. Commonwealth*, 303 Ky. 834, 836, 198 S.W.2d 785–86 (Ky.1947) (defendant kept in handcuffs during trial).

What Justice Cardozo so aptly pointed out in *Snyder v. Commonwealth of Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), is still true today: "[n]o doubt [a] privilege may be lost . . . by misconduct." 291 U.S. at 106, 54 S.Ct. at 332.

In *Illinois v. Allen*, the United States Supreme Court held that a defendant can forfeit his Sixth Amendment right to be present at trial so long as a prior warning and discussion of the probable consequences are set forth prior to the defendant's removal. 397 U.S. at 343, 90 S.Ct. 1057 ("It is essential to the proper administration of criminal justice that dignity, order and decorum be the hallmark of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated"). In *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Court noted that a "trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." 422 U.S. at 834, n. 46, 95 S.Ct. 2525. Thus, forfeiture of a constitutional right does not depend upon the consent of the accused, but rather upon his conduct and the necessity of the judicial system to function in a constitutionally envisioned manner.

While it is undisputed that Appellant had a constitutional right to testify, it is "crystal clear that there is no right whatever—constitutional or otherwise—for a defendant to use false evidence." *Nix v. Whiteside*, 475 U.S. 157, 173, 106 S.Ct. 988, 997, 89 L.Ed.2d 123 (1986). Indeed, the United States Supreme Court has warned that "when defendants testify, they must testify truthfully or suffer the consequences." *United States v. Havens*, 446 U.S. 620, 626, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). *See also, Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971) ("privilege cannot be construed to include the right to commit perjury").

Nor does the right to counsel include a "right to have a lawyer who will cooperate with planned perjury." *Nix*, 475 U.S. at 173, 106 S.Ct. 988. "When an accused proposes to result to perjury or to produce false evidence, one consequence is the risk of withdrawal of counsel." *Id.* at 174, 106 S.Ct. 988. Plainly, the right to appointed counsel for indigent defendants is a necessary mainstay of any civilization that values truth as the arbitrator of consequence. But as noted, "the privilege may be lost ... by misconduct." *Snyder*, 291 U.S. at 106, 54 S.Ct. 330.

Of course, there are competing interests in this case that must be balanced. These interests include the protection of the courtroom as a bastion of truth, justice, and decorum, against an individual defendant's right to counsel, to testify, and to a "fair trial." *But Nix specifically held that "there was no permissible choice to testify falsely"* and "the right to counsel includes *no right* to have a lawyer who will cooperate with planned perjury." *Nix*, 475 U.S. at 173, 106 S.Ct. 988 (emphasis added). And what is a "fair trial" is defined within the context of events that occurred. *Cf. Deck v. Missouri*, 544 U.S. at 633, 125 S.Ct. 2007. *Nix* also pointed out that "[w]hen an accused proposes to result to perjury or produce false evidence, one consequence is the risk of withdrawal of counsel." *Id.* at 174, 106 S.Ct. 988. *Havens* makes it clear that "when defendants testify, they must testify truthfully or suffer the consequences." *Havens*, 446 U.S. at 626, 100 S.Ct. 1912.

Accordingly, when the trial court was presented with the presentation of false testimony, it was required by *Nix* to respect and uphold the Criminal Justice System's paramount interest in truth and justice. In fact, when it comes to the presentation of false testimony, there is simply no recognized competing right to present, or have a lawyer assist, in the presentation of such testimony, or its protection.

What we are *really weighing* here, is how "critical [truth is] to the ability of the adversarial system to produce just results." *Strickland*, 466 U.S. at 685–86, 104 S.Ct. 2052. I believe it is and should remain paramount. If there is any line to be drawn in the sand of jurisprudence, this is it. And since the "search for the truth," is the ultimate driver of almost every decision we make, whether legal, evidentiary, or procedural, I believe *Nix* was correct in its pronouncement that, "the right to counsel includes *no right* to have a lawyer who will cooperate with planned perjury." *Nix*, 475 U.S. at 173, 106 S.Ct. 988. (Emphasis added).

"On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend upon its exercise. . . . On the other, it is extremely desirable that the respectability of the bar should be maintained. . . ." *In re Taylor*, 300 Ky. 448, 189 S.W.2d 403, 405 (1945). As a means of protecting our system of advocacy, we have recognized the play ethical standards have in the advocacy necessary to support our system of justice. For example in *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811(1963), the United States Supreme Court, via the Fourteenth Amendment, held that the States must provide indigent persons with counsel on the first appeal as a matter of right. Yet, we recognize limitations on this right, given the ethical obligations required for membership in our bars. *See McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 436, 108 S.Ct. 1895, 1901, 100 L.Ed.2d 440 (1988) ("An attorney, whether appointed or paid, is therefore under an ethical obligation to refuse to prosecute a frivolous appeal").

In this same regard, the Kentucky Rules of Professional Conduct, SCR 3.130–3.3(a)(3), establish that a lawyer, shall not "offer evidence that the lawyer knows to be false." SCR 3.130–1.16(a)(1) provides that, where the *representation has commenced,* a lawyer, "shall withdraw from the representation of a client if ... [t]he representation will result in violation of the rules of Professional Conduct *or other law.*" (Emphasis added). SCR 3.130–1.6 establishes that "[a] lawyer shall not reveal information related to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as in stated in paragraph (b)." SCR 3.130–1.6(b) *authorizes the disclosure* of such information, but only when the lawyer reasonably believes that it is necessary (1) to prevent the client from committing a criminal act likely to result in imminent death or substantial bodily harm, or (2) *to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and client,* or (3) to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or (4) to respond to allegations in any proceeding concerning the lawyer's representation of the client, or (5) to comply with other law or court order.

Since our ethical rules in this regard are intended to keep members of our Bar safe from the "clutches" of criminal statutes, it is pertinent that we review several. "A person is guilty of perjury in the first degree when he makes a material false statement, which he does not believe, in any official proceeding under an oath required or authorized by law...." KRS 523.020(1). "A person *is guilty of an of-*

*fense committed by another person* when, with the intention of promoting or facilitating the commission of the offense, he ... aids, counsels, or attempts to aid such person in planning or committing the offense ... or having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so." KRS 502.020(1). (Emphasis added). And "[a] person is guilty of *criminal facilitation* when, acting with knowledge that another person is committing or intends to commit a crime, he engages in conduct which knowingly provides such person with means or opportunity for the commission of the crime and which in fact aids such person *to commit the crime.*" KRS 506.080(1). (Emphasis added).

The official comments to SCR 3.130–3.3 recognize, *but do not propose,* three possible resolutions to the dilemma presented where the accused insists on testifying when the lawyer *knows* the testimony will be perjurious.[5] The first scenario is to allow the accused to testify by narrative without guidance by the lawyer, but the lawyer stays in the trial. The commentaries acknowledge however, that "[t]his compromises both contending principles; it exempts the lawyer from the duty to disclose false evidence but subjects the client to an implicit disclosure of information imparted to counsel." SCR 3.130–3.3, Comment 9. The second scenario is that the advocate be *entirely excused* from the duty to reveal perjury if the perjury is that of the client. Here our official comments acknowledge that this "makes the advocate a knowing instrument of perjury." *Id.* The third scenario is that "the lawyer must reveal the client's perjury if necessary to rectify the situation." *Id.* at Comment 10. Here our comments note, "an advocate has an obligation, not only in professional eth-

---

**5.** There is a significant ethical difference between "thinking" a clients testimony might be

false and "knowing" it is. On one, counsel must act, on the other, counsel may not.

ics, but under the law as well, *to avoid implication* in the commission of perjury." *Id.* (Emphasis added). We also note that *"an accused should not have a right to assistance of counsel in committing perjury." Id.* (Emphasis added). This is consistent with what the United States Supreme Court said in *Nix, supra,* namely that:

> The positive authority on the subject of any such right may be explained by the fact that such a notion has never been responsibly advanced; the right to counsel includes no right to have a lawyer who will cooperate with planned perjury. A lawyer who would so cooperate would be at risk of prosecution for suborning perjury, and disciplinary proceedings, including suspension or disbarment.

*Nix,* 475 U.S. at 173, 106 S.Ct. 988.

It is also consistent with *United States v. Havens,* 446 U.S. at 626, 100 S.Ct. 1912, to the effect that "when defendants testify, they must testify truthfully or suffer the consequences." *Id.* And "[w]hen an accused proposes to resort to perjury or to produce false evidence, one consequence is the risk of withdrawal of counsel." *Nix,* 475 U.S. at 174, 106 S.Ct. 988.

This occurred here, yet the "limited forfeiture" in this case was so well-managed by the court that it protected both Appellant's rights and the need of the Justice System to preserve its integrity, decorum, and its paramount interest in the search for the truth. I can not conceive of a better solution which addresses all the rights and concerns than what occurred.

The majority, however, adopts a scenario which is somewhat of a hybrid of scenarios one and three as noted in SCR 3.130–3.3, Comments 7–10, that of requiring counsel to apprise the court of impending false testimony followed by a narrative from the client of his testimony without guidance through the lawyer's questioning. The lawyer will then assist the accused by making appropriate objections to any attempted cross-examination. Moreover, counsel is allowed to make the closing argument, *but may not refer to any of the evidence counsel believes, in good faith, with a firm basis in objective fact for such a belief, was false.*[6] Thus, in this case, the majority finds reversible error because Appellant's counsel withdrew during Appellant's narrative and did not present closing argument. The majority is also bothered by the fact that Appellant's counsel resumed his representation during the sentencing phase of the trial.

The majority finds this conduct disturbing because it *may have "tipped off"* the jury that something was wrong. How could that be? The jury took seven hours to reach its verdict and *then acquitted the Appellant of four of the five felony charges presented in the guilt phase.* Indeed, if the majority's premise were to be followed to its logical conclusion, then the narrative statement itself, or anything out of the ordinary for that matter, would be impermissible and prejudicial since it too could "tip off" the jury. The four "not guilty" verdicts here say otherwise. Here, the jury was told by the Court that Appellant was now representing himself. Thus, under these facts, I cannot accept that a "tip off" to the jury did occur.

"Under any standard of proper ethical conduct an attorney should not sit by silently and permit his client to commit what may have been perjury, and which certainly would mislead the court and the opposing party on a matter vital to the issue under consideration." *In re Carroll,* 244 S.W.2d 474, 475 (Ky.1951). One's duty to

---

**6.** "An attorney may thus continue to represent his client on all parts of the trial not connected to the alleged perjury." Op. at 84.

a client "does not extend to the point of authorizing collaboration with him in the commission of fraud." *Id.* at 475. Nor does it obviate the fact that "respondent's conduct [would have been] unethical and was of the type which impairs public confidence in the high moral standards of the legal profession." *Id.* "He is an officer of the court,—a minister in the temple of justice. His high vocation is to correctly inform the court upon the law and the facts of the case, and to aid it in doing justice and arriving at correct conclusions. He violates his oath of office when he resorts to deception, or permits his clients to do so." *In re Taylor,* 300 Ky. 448, 448, 189 S.W.2d 403, 403–04 (1945).

The majority also argues that Appellant was deprived of counsel during the non-perjurious parts of the trial. Specifically, the majority contends that counsel should have stayed to offer objections during the nonperjurious parts of cross-examination and to offer a closing argument. I can not agree to this argument.

First, as set forth above, Appellant's misconduct effectively forfeited his right to counsel for this limited period. *Nix,* 475 U.S. at 174, 106 S.Ct. 988 ("When an accused proposes to resort to perjury or to produce false evidence, one consequence is the risk of withdrawal of counsel."). Second, once the presumably perjurious testimony was presented to the jury, the presence of counsel for the purpose of presenting a closing argument would have been more prejudicial to Appellant than Appellant presenting the closing argument himself. For example, the inability to argue the false evidence, which, more than likely, *will be his best defense* ("I wasn't there!", etc.) in closing, or even to object to its cross-examination, presents a certainty that the *jury will notice* and believe that the defendant's own lawyer *does not believe his client's*

*denials.* This, to me, infringes upon a defendant's right to a fair trial much more so than being told the defendant will now represent himself.

Finally, the majority finds error with the trial court allowing counsel to return once the guilt phase of the trial was concluded. Presumably, the majority believes that when counsel returns, the jury would then have figured out that Appellant lied and thus, would have punished him more severely during the penalty phase. However, this is entirely too speculative in my opinion. Even Appellant did not believe as much since he allowed counsel to resume his representation and did not request either: (1) to continue representing himself during the penalty phase; or (2) request different counsel for the sentencing proceeding.

Moreover, there was no allegation whatsoever by Appellant that the jury was persuaded by such passion or prejudice. It is equally likely that the jury would have presumed that Appellant reconciled with the attorney after a mid-trial disagreement and conviction. And even if there were some prejudice in allowing the attorney to resume his representation, it certainly would present no more unnecessary prejudice than being "shackled" during a trial. *See Deck v. Missouri,* 544 U.S. at 633, 125 S.Ct. 2007.

Here, only after extensive discussions with both Appellant and counsel and after warnings of the possible consequences were given to the Appellant, did the court allow Appellant's counsel to withdraw, yet, remain on call, in the event of the need for a sentencing phase. The warnings to the Appellant were extensive as to the probable effects. The court then directed the Appellant and counsel to further discuss the matter over the lunch recess. Only after having assured itself that Appellant desired to proceed with the subject testi-

mony, notwithstanding the forthcoming withdrawal of counsel, did the court impose a "limited forfeiture." The jury was then told Appellant was now representing himself. They knew nothing of the reasons therefore. Appellant took the stand and gave his "narrative," was cross-examined by the Commonwealth, and rested. Appellant made his own closing statement and the Commonwealth theirs. He argued all the points of his evidence *and was not limited as counsel would now be.* The jury then retired and returned their verdict of guilty, whereupon Appellant's counsel resumed his representation and concluded the sentencing phase of the trial.

When the totality of the circumstances in this case are reviewed, not only do I find no error, but I find the trial court's handling of this matter to be a model for future attorneys and judges. After exhaustive warnings and several chances for Appellant to be dissuaded from offering false testimony, Appellant simply forfeited his right to counsel for the limited parts of the proceeding that might reasonably be perceived as dealing with his false testimony. The court elected the best possible means of protecting not only Appellant's right to counsel, but also his right to testify, and to a fair trial. Therefore, I must respectfully dissent since I would affirm the "limited forfeiture" and the convictions.

McANULTY, J., joins this dissent.